**In re JONES TRUCK LINES, INC., Debtor.**

**JONES TRUCK LINES, INC., Debtor–In–Possession, Plaintiff,**

v.

**MARATHON ELECTRIC MANUFACTURING CORPORATION, Defendant.**

No. 93–C–983.

United States District Court, E.D. Wisconsin.

Feb. 2, 1995.

Paul R. Jaessing, Waukesha, WI, for plaintiff.

William P. Dineen, Dineen Law Offices, S.C., Milwaukee, WI, for defendant.

## DECISION AND ORDER

WARREN, District Judge.

Before the Court are the defendant's Motion for Stay and Referral to the Interstate Commerce Commission ("ICC") and the plaintiff's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) ("Rule 56(c)") in the above-captioned matter. For the following reasons, the defendant's motion is granted, and the plaintiff's motion will be held in abeyance pending ICC determination of (1) the reasonableness of the tariff rate sought by Jones; (2) its motor carrier status; and (3) the applicable tariff rate. During the interim, this case shall be closed for statistical purposes, and may be reopened by either party after ICC resolution of such issues.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Between July and September, 1988, plaintiff Jones Truck Lines, Inc. ("Jones") transported approximately one hundred twenty-nine (129) truckload shipments of goods on behalf of defendant Marathon Electric Manufacturing Corporation ("Marathon"). (Pl. Mem.Supp.Summ.J. at 1.) Shortly thereafter, Jones became insolvent; it currently exists as a debtor-in-possession in a Western District of Arkansas bankruptcy proceeding. (Compl. ¶ 2.) On July 6, 1993, Jones filed the instant Complaint, seeking ex-post facto collection of $9,874.06 in freight charges plus interest allegedly owed by Marathon based on tariffs filed by Jones with the ICC. Marathon answered on July 23, 1993, denying Jones' charges and bringing eighteen (18) affirmative defenses[1] including, *inter alia,*

---

1. Henceforth, the defendant's affirmative defense regarding the reasonableness of Jones' filed tariff rate will be treated by the Court as a counterclaim brought under Federal Rule of Civil Procedure 13. *Reiter v. Cooper,* —— U.S. ——, ——, 113 S.Ct. 1213, 1217, 122 L.Ed.2d 604 (1993)

(finding that, where defendant in filed rate doctrine case mistakenly designated their counterclaims based on the unreasonableness of the claimed tariff rate as defenses, Federal Rule of Civil Procedure 8(c) required the court to "treat

the inapplicability of the filed rate doctrine[2] given Jones' status as a motor contract carrier, the unreasonableness of the claimed tariff rate, and its "unreasonable practice" of attempting to collect purported undercharges. Marathon also filed a counterclaim pursuant to 49 U.S.C. § 11705(b)(3), seeking to enforce its reparations right based on the unreasonableness of Jones' claimed tariff rate.[3]

On June 9, 1994, Marathon filed a Motion for Stay and Referral to the ICC, arguing that, pursuant to the Negotiated Rates Act of 1993 ("1993 Act"), the ICC has primary and exclusive jurisdiction over the threshold issue of whether the shipments moved under contract, rather than common, carriage, thereby rendering the "filed rate doctrine" advanced by Jones inapplicable. Marathon further asserts that the 1993 Act gives the ICC primary jurisdiction to determine whether the attempt to collect the tariff rate is an "unreasonable practice." Marathon also argues that the need for uniformity in interpreting relevant statutory and regulatory provisions requires ICC expertise. Finally, Marathon argues that, under the majority view, the reasonableness of the tariff rate advanced by Jones must also be decided by the ICC.

The plaintiff responded on June 20, 1994,[4] arguing that the 1993 Act is inapplicable in this case given 11 U.S.C. § 541(c)(1), which provides that "an interest of the debtor in property becomes property of the [debtor's estate] ... notwithstanding any provision in ... applicable nonbankruptcy law ... that is conditioned on the insolvency or financial condition of the debtor." According to Jones, referral of this matter to the ICC under the provisions of the 1993 Act would cause an impermissible forfeiture of its property; specifically, the right to recover freight undercharges under the filed rate doctrine. Jones also claims that, even if the 1993 Act is applicable in this case, relevant provisions have not been given retroactive effect. Jones further asserts that Marathon has not

met its burden of showing, beyond mere allegation, that the tariff rates filed were, in fact, unreasonable, and emphasizes the ICC's apparent inability to render timely decisions. Jones also claims that it operated as a motor common, rather than motor contract, carrier. Finally, Jones suggests that the Court enter judgment on its claim and stay enforcement, allowing discovery on the issue of Marathon's financial solvency.

Marathon replied on June 29, 1994, listing a number of cases where courts have applied the 1993 Act despite the fact that the carrier was in bankruptcy and reiterating several points made in its principal brief.

On July 26, 1994, Jones moved for summary judgment, arguing that, despite Marathon's counterclaim that its tariffs were unreasonable, enforcement of its undercharge claim is warranted under *Reiter v. Cooper*, —— U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). According to Jones, referral of this action to the ICC is inappropriate because Phoenix has given inadequate evidence of tariff unreasonableness, the ICC policy on determining the reasonableness of negotiated rates is in a state of flux, and the 1993 Act is inapplicable to this case. Marathon's unreasonable-rate counterclaim may nevertheless be protected, Jones argues, by requiring Marathon to pay into the court the amount owed under Jones' filed rate while it litigates "rate reasonableness" with the ICC, or by entering judgment and staying enforcement. Jones further claims an entitlement to prejudgment interest accruing from the date of each shipment.

Marathon responded on August 25, 1994, arguing that the plaintiff misrepresented the law in its brief and that summary judgment is inappropriate. Marathon emphasizes that it is challenging the tariff rate sought by Jones in this case based on Jones' status as a motor contract carrier as well as its unreasonableness; Marathon argues that, if Jones acted as a motor contract carrier, rather than

the pleading as if there had been a proper designation").

**2.** "The filed rate doctrine embodies the principle that a shipper cannot avoid payment of the tariff rate by invoking common-law claims and defenses such as ignorance, estoppel, or prior agreement to a different rate." *Reiter*, —— U.S. at ——, 113 S.Ct. at 1219.

**3.** *See infra* note 1.

**4.** Plaintiff's counsel should familiarize himself with Local Rule 6.01(c), which states that, "[e]xcept by permission of the court, principal briefs on motions shall not exceed 30 pages."

a motor common carrier, the Transportation Agreement entered into by the parties, rather than the filed rate doctrine, establishes the proper shipment charge. Marathon also claims that *Reiter* instructs lower courts to ordinarily *not* grant judgment for carrier undercharges prior to adjudication of a shipper's counterclaim, and that Jones has shown no danger or hardship warranting equitable departure from this rule. The defendant also asserts that prejudgment interest is inappropriate in this case.

## II. *STANDARD OF REVIEW*

### 1. *Rule 54(b):*

Federal Rule of Civil Procedure 54(b) ("Rule 54(b)") provides that:

> "[w]hen more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."

*See Reiter,* —— U.S. at ——, 113 S.Ct. at 1218; *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 438, 76 S.Ct. 895, 901, 100 L.Ed. 1297 (1956); *Cold Metal Process Co. v. United Eng'g & Foundry Co.,* 351 U.S. 445, 76 S.Ct. 904, 100 L.Ed. 1311 (1956). A district court's power to separate judgments under Rule 54(b) is "largely discretionary," and should be exercised in light of "judicial administrative interests as well as the equities involved," giving due weight to the "historical federal policy against piecemeal appeals." *Reiter,* —— U.S. at ——, 113 S.Ct. at 1218; *Curtiss–Wright Corp. v. General Elec. Co.,*

446 U.S. 1, 8, 100 S.Ct. 1460, 1464, 64 L.Ed.2d 1 (1980); *Sears,* 351 U.S. at 438, 76 S.Ct. at 901.

"Nothing in the [Interstate Commerce Act] provides that, in an action by a carrier to collect undercharges, a § 11705(b)(3) counterclaim is not subject to the normally applicable provisions of the Federal Rules," including Rule 54(b). *Reiter,* —— U.S. at ——, 113 S.Ct. at 1219. Thus,

> "[i]n the ordinary case, where a carrier is solvent and has promptly initiated suit, the equities favor separate judgment on the principal claim: referral of the unreasonable-rate issue could produce substantial delay, and tariff rates not disapproved by the ICC are legal rates, binding on both the shipper and the carrier. The equities change, however, when the suing carrier is in bankruptcy. Indeed, we have previously held that even a 'threat of insolvency' of the party seeking separate judgment is a factor weighing against it. Even so, we cannot say that insolvency is an absolute bar. Conceivably, a district court could determine that other equities favor separate judgment—for example, a threat that the *shipper* may become insolvent, which Rule 62(h) would allow a court to protect against by entering separate judgment for the carrier but staying enforcement on condition that the shipper deposit the amount of the judgment with the court."

*Id.* at ——, 113 S.Ct. at 1221 (citations omitted).

### 2. *Rule 56(c):*

Rule 56(c) deems summary judgment appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists only where a reasonable jury could make a finding in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Santiago*

*v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). An issue of fact must also be material, as "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. *See also Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992); *Local 1545, United Mine Workers of Am. v. Inland Steel Coal Co.,* 876 F.2d 1288, 1293 (7th Cir.1989). The presence of a genuine issue of material fact is to be determined by the substantive law controlling that case or issue. *Anderson,* 477 U.S. at 254–55, 106 S.Ct. at 2513; *Santiago,* 894 F.2d at 221. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine need for trial and summary judgment is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Local 1545,* 876 F.2d at 1292. Once this burden is met, the non-moving party must "go beyond the pleadings" and designate specific facts to support each element of its cause of action, showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552; *Local 1545,* 876 F.2d at 1293. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Koclanakis v. Merrimack Mut. Fire Ins. Co.,* 899 F.2d 673, 675 (7th Cir.1990), or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir. 1985), and both parties must produce proper documentary evidence to support their contentions. *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990); *Local 1545,* 876 F.2d at 1293. In deciding a summary judgment motion, the Court must view the record in a light most favorable to the non-moving party, and all reasonable inferences shall be drawn in that party's favor. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Santiago,* 894 F.2d at 221. A court need not draw every

inference from the record, only reasonable inferences. *Local 1545,* 876 F.2d at 1292–93; *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 886 (7th Cir.1989).

## III. DISCUSSION

### A. LEGAL STANDARDS:

### 1. Defenses to the filed rate doctrine prior to the Negotiated Rates Act of 1993:

Shippers' standard defenses to the filed rate doctrine in undercharge actions have traditionally been (1) that the agreed-upon rate, rather than tariff rate, should apply because the carrier acted as a motor contract, rather than motor common, carrier; (2) that the carrier's attempt to collect more than the agreed-upon rate is an "unreasonable practice" proscribed by the Interstate Commerce Act ("ICA") at 49 U.S.C. § 10701(a); and (3) that the filed tariff rate was unlawful because it was unreasonably high under § 10701(a) of the ICA. *See Reiter,* — U.S. at ——, 113 S.Ct. at 1216. If a carrier was acting as a motor contract, rather than a motor common, carrier, then the first defense was applicable because a carrier may not invoke the filed rate doctrine in attempting to collect alleged undercharges. *See, e.g., Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 133, 110 S.Ct. 2759, 2769, 111 L.Ed.2d 94 (1990); *Atlantis Express, Inc. v. Standard Transp. Serv., Inc.,* 955 F.2d 529, 533 (8th Cir.1992); *Exemption of Motor Contract Carriers from Tariff Filing Requirements,* 133 M.C.C. 150 (1983), *aff'd sub nom. Central & Southern Motor Freight Tariff Ass'n, Inc. v. United States,* 757 F.2d 301, *cert. denied* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). Shippers, however, could not assert as *affirmative defenses* that the carrier's attempt to collect more than the agreed-upon rate constituted an "unreasonable practice," *see Maislin,* 497 U.S. at 129, 110 S.Ct. at 2767, or that the filed tariff rate itself was unreasonable. *Reiter,* — U.S. at ——, 113 S.Ct. at 1219 (finding that shippers cannot avoid the tariff rate by invoking "any 'unreasonable rate defense' derived from the general ICA

requirement (now codified in § 10701(a)) that a carrier's rates be 'reasonable' ").

Shippers could, however, raise the latter issue as a counterclaim in an undercharge action brought by a carrier. The Supreme Court has recognized that shippers may avoid the filed tariff rate "through claims and defenses that are specifically accorded by the ICA itself," including "asserting (*by way of claim or counter-claim*) the reparations rights explicitly conferred by § 11705(b)(3)" of the ICA. *Reiter*, —— U.S. at ——, 113 S.Ct. at 1219 (emphasis added). Specifically, "§ 11705(b)(3) gives shippers an express cause of action against carriers for damages (called "reparations" in the pre-codified version of the statute, see 49 U.S.C. §§ 304a(2), (5) (1976 ed.)) in the amount of the difference between the tariff rate and the rate determined to be reasonable by the ICC." *Id.* at ——, 113 S.Ct. at 1217. Because this provision "provides a *cause of action* rather than a *defense*," it allows a shipper to raise the "unreasonable rate" issue as a mandatory counterclaim, amenable to a separate final judgment under Federal Rule of Civil Procedure 54(b), rather than as an affirmative defense. *Id.* at ——–——, 113 S.Ct. at 1217–18. This holds true even if a shipper has "mistakenly designated [its] counterclaims as defenses, since Federal Rule of Civil Procedure 8(c) provides that 'the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.' " *Id.* at ——, 113 S.Ct. at 1217. In effect, then, carriers may not invoke the filed rate doctrine as granting them an absolute entitlement for alleged undercharges if, *inter alia,* the ICC finds the filed tariff rate to be unreasonable. *Id.* at ——–——, 113 S.Ct. at 1217–19; *Maislin,* 497 U.S. at 128, 110 S.Ct. at 2766 (noting that "[t]he filed rate [doctrine] is not enforceable if the ICC finds the rate to be unreasonable").

## 2. *Defenses to the filed rate doctrine after the Negotiated Rates Act of 1993:*

The 1993 Act amended the ICA on several counts. As an initial matter, it allows shippers to settle tariff disputes by paying a specified percentage of claimed undercharges "when a claim is made by a motor carrier of property providing transportation subject to the jurisdiction of the Commission ... or by a party representing such a carrier ... regarding the collection of rates or charges for such transportation in addition to those originally billed and collected by the carrier ... [if] the carrier ... is no longer transporting property." 49 U.S.C. § 10701(f)(1 through 4). A shipper who does not elect to settle, on the other hand, may continue pursuing all rights and remedies existing under the ICA, including any right to reparations. 49 U.S.C. § 10701(f)(5).

The 1993 Act, however, also grants additional rights to non-settling shippers. Specifically, a non-settling shipper who challenges "the reasonableness of the legally applicable freight rate or charges being claimed by [the] carrier" need not "pay any additional compensation to the carrier ... until the Commission has made a determination as to the reasonableness of the challenged rate as applied to the freight of the person against whom the claim is made." 49 U.S.C. § 10701(f)(6). *Cf. Reiter,* —— U.S. at ——, 113 S.Ct. at 1221 (finding that judgment may be entered against the shipper under Rule 54(b) in "the ordinary case where a carrier is solvent," although the Court may then stay its enforcement under Rule 62(h)). The above-cited provisions of § 10701(f) apply to any undercharge claim pending as of December 3, 1993, the effective date of the 1993 Act. Pub.L. No. 103–180, 107 Stat. 2047, § 2(c) (1993).

Similarly, a non-settling shipper who claims that a carrier is engaging in an "unreasonable practice" by seeking undercharges despite the parties' agreed-upon rates need not "pay any additional compensation to the carrier ... until the Commission has made a determination as to the reasonableness of the practice" *if the transportation service at issue was provided before September 30, 1990.* Pub.L. No. 103–180, 107 Stat. 2047–48, § 2(e) (1993) (emphasis added). This provision, then, overrules *Maislin* as to any "unreasonable practice" defense to an undercharge claim where transportation services were provided by the carrier prior to September 30, 1990. Unlike § 10701(f), however, this provision does not contain a retro-

activity clause making it applicable to cases pending as of December 3, 1993, its date of enactment.

The 1993 Act also provides for ICC review of whether a carrier with "dual" transport capacity acted as a motor common or motor contract carrier; as previously indicated, only the former may invoke the filed rate doctrine in an attempt to collect alleged undercharges. Specifically,

> "[i]f a motor carrier ... has authority to provide transportation as both a motor common carrier and a motor contract carrier and a dispute arises as to whether certain transportation is provided in its common carrier or contract carrier capacity and the parties are not able to resolve the dispute consensually, *the Commission shall have jurisdiction to, and shall, resolve the dispute.*"

49 U.S.C. § 11101(d) (emphasis added). Again, however, this provision does not contain a retroactivity clause making it applicable to cases pending as of December 3, 1993, its date of enactment.

### B. *ANALYSIS:*

As previously indicated, the parties contest whether (1) Jones was operating as a motor contract or motor common carrier, (2) the tariff rate charged by Jones, if it acted as a motor common carrier, was reasonable, and (3) it is an "unreasonable practice" for Jones to seek undercharges despite the parties' negotiated rate under the Transportation Agreements. If Jones' claimed tariff rate is found to be unreasonable, it becomes more likely that it acted as a motor contract, rather than motor common, carrier. The extent to which the filed rate may be found to be unreasonable, in turn, may affect one's analysis of whether an attempt to recover undercharges constitutes an "unreasonable practice." A determination as to the reasonableness of the tariff rate sought by Jones, then, serves two purposes; it helps to establish or deny Phoenix' right to reparations in its counter-claim, and provides evidence of Jones' carrier status and the propriety of its conduct. As a result, it is sensible to address the reasonableness of Jones' claimed tariff

rate before addressing the other two issues in this case.

### 1. *Reasonableness of Jones' filed tariff rate:*

■ We previously saw that Jones cannot invoke the filed rate doctrine if its filed tariff rate is found to be unreasonable, regardless of whether Marathon's claim is characterized as a defense or a counterclaim. *Reiter*, — U.S. at ——-——, 113 S.Ct. at 1216–17, 1219. Pre–1993 Act courts could exercise discretion in making an unreasonableness determination; often times, they "referred" this matter to the ICC for resolution under the doctrine of primary jurisdiction by "staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Id.* at ——, 113 S.Ct. at 1220. The 1993 Act, however, provides for suspension of enforcement of the filed rate doctrine where tariff reasonableness is challenged *"until the Commissioner"* has made a reasonableness determination, *see* 49 U.S.C. § 10701(f)(6); because Congress expressly segregated issues to be decided by the courts and the ICC in related provisions of the 1993 Act, *see* 49 U.S.C. § 10701(f)(1), this specific reference to the ICC must be construed as an explicit grant of primary authority. And by specifying ICC, rather than Court, review, subsection (6) precludes the Court from enforcing a separate judgment under Rule 54(b) until the ICC determines the reasonableness of the tariff rate claimed by Jones. As acknowledged by Jones, retroactive application is not a concern, as the 1993 Act makes clear that these provisions apply to all unreasonable-rate claims pending as of December 3, 1993, its effective date. Pub.L. No. 103–180, 107 Stat. 2047, § 2(c) (1993).

■ Jones nevertheless suggests that Marathon must first make "a threshold showing of the unreasonableness of its tariff rate" before seeking ICC review, while Marathon argues that immediate referral to the ICC is appropriate; both parties cite pre–1993 Act cases supporting their view. This Court finds that the minimum evidentiary requirement sought by Jones would unduly infringe on the authority conferred on the ICC by Congress in § 10701(f)(6). As suggested by the language of that provision, a

shipper must present an adequate "challenge" to tariff reasonableness to invoke its protection; this, in turn, certainly requires more than a conclusory statement. It does not, however, demand evidentiary proof such as that weighed in summary judgment; by evaluating such evidence, the Court would be placing itself in the shoes of the ICC, thereby invading its statutory authority. If a party alleges facts which, if believed, would indicate that the filed rate is unreasonable, it has, in this Court's view, adequately "challenged" that rate for purposes of the statute; it is the ICC's duty to then assess the weight of its evidentiary support in light of appropriate standards. The Court believes that this is the fairest reading of both the explicit language and statutory intent of § 10701(f)(6).[5] Therefore, because Congress has removed from this Court discretionary authority in determining the reasonableness of tariff rates, and because § 10701(f)(6) suggests that ICC review is immediately appropriate once a challenge to tariff reasonableness is made, the Court is compelled to stay this matter pending an ICC ruling on such issue, and rejects Jones' contention that Marathon is required to make a threshold showing of unreasonableness to this Court to justify ICC review.

■ Moreover, even if the Court retained the discretionary authority described in *Reiter*, we would nevertheless refer the issue of tariff reasonableness to the ICC without rendering judgment on Jones' claim. As previously indicated, the Supreme Court in *Reiter* noted that the issuance of a separate judgment under Rule 54(d) prior to resolving the issue of tariff unreasonableness is disfavored when a suing carrier is bankrupt; as a result, immediate referral of Marathon's unreasonable-rate claim to the ICC seems fair and appropriate under the old standard. *Reiter*, —— U.S. at ——, 113 S.Ct. at 1221. Jones' remaining arguments against ICC referral, that ICC jurisprudence on this issue is "ever changing" and that ICC litigation is prohibitively time-consuming, while seemingly precluded under the 1993 Act, are similarly un-

persuasive under the old standard. The Court has full confidence in the ICC's ability to address this matter expeditiously, and to use its expertise regarding tariff rates to reach a just and fair decision. Moreover, as previously indicated, Jones' bankrupt status makes referral to the ICC preferable, and there is no indication that Marathon may become insolvent. For all these reasons, the Court refers to the ICC for resolution the question of the reasonableness of Jones' claimed tariff rate.

### 2. *Jones' motor carrier status:*

■ We previously saw that the filed rate doctrine is inapplicable if, as Marathon claims, Jones acted as a motor contract, rather than a motor common, carrier. *See, e.g., Maislin,* 497 U.S. at 133, 110 S.Ct. at 2769; *Atlantis Express,* 955 F.2d at 533. But again, who should make this determination? As suggested by Marathon, the 1993 Act grants the ICC clear authority to determine a "dual" carrier's motor status, *see* 49 U.S.C. § 11101(d); however, this provision does not contain a retroactivity clause making it applicable to cases, such as this one, which were pending as of the effective date of the 1993 Act.

Nevertheless, while acting as an affirmative grant of authority to the ICC, this provision does little to change pre–1993 referral practice, *see Reiter,* —— U.S. at —— n. 3, 113 S.Ct. at 1220 n. 3; at best, it represents a procedural change, rather than a substantive addition, to the ICA. As a "new" procedural rule, then, this provision should be applied to cases pending as of its date of enactment, as it does not establish "new legal consequences to events completed before its enactment." *Landgraf v. USI Film Products,* —— U.S. ——, ——––——, 114 S.Ct. 1483, 1499–1502, 128 L.Ed.2d 229 (1994) (noting that "statutes conferring or ousting jurisdiction [or] changing procedural rules" are deemed not to be retroactive in nature). *See also Mojica v. Gannett Co., Inc.,* 7 F.3d 552, 559 (7th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1643, 128 L.Ed.2d 363 (1994) ("a statute may

**5.** Moreover, even if we were to adopt Jones' proposed *test,* we would nevertheless conclude that Marathon, through the affidavit of its expert,

Michael Bange, has made a threshold showing of tariff unreasonableness in this case.

include certain procedural or damage provisions which do not impact substantive rights, and therefore should apply to" cases pending at the time of enactment); *Mozee v. American Commercial Marine Serv. Co.,* 963 F.2d 929, 939 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 207, 121 L.Ed.2d 148 (1992) ("it is arguable that courts should apply the [Title VII] procedural and damage provisions in effect at the time of the trial"); *Luddington v. Indiana Bell Tel. Co.,* 966 F.2d 225, 228 (7th Cir.1992) ("[p]rocedural innovations not likely to bias a decision systematically in favor of one litigant rather than his opponent can, without serious affront to the values crystallized in the phrase 'rule of law,' be applied to cases pending when the innovations were adopted"). As a result, this provision of the 1993 Act is applicable to this case, and referral to the ICC for resolution of the parties' dispute regarding Jones' motor carrier status is again appropriate.

### 3. *Jones' seeking of undercharges as an "unreasonable practice":*

■ We are precluded, however, from referring to the ICC the third contested issue between the parties; namely, whether it is an "unreasonable practice" for Jones to seek undercharges despite the negotiated rates given in the Transportation Agreements. In *Maislin,* the Supreme Court held that the ICC, and presumably any reviewing court, had no authority to depart from the filed tariff doctrine based on its determination that a carrier engaged in an "unreasonable practice" by attempting to collect the filed rate after the parties had negotiated a lower charge. *Maislin,* 497 U.S. at 129–36, 110 S.Ct. at 2767–71. The 1993 Act, however, amended this rule in cases where the carrier provided transportation services prior to September 30, 1990, requiring ICC review of "unreasonable practice" challenges brought under such circumstances. P.L. 103–180, § 2(e), 107 Stat. 2047. Marathon properly notes that the transportation services provided by Jones in this case predate that cutoff date. Again, however, unlike § 10701(f), this provision does not contain a retroactivity clause making it applicable to cases, such as this one, which were pending as of December 3, 1993, its date of enactment.

Unlike the "dual" carrier provision of the 1993 Act discussed in the preceding section, however, application of the "unreasonable practice" provision of the 1993 to this case would violate the general retroactivity principles advanced in *Landgraf* and its progeny. In *Landgraf,* the Supreme Court acknowledged two types of retroactivity problems; the application of newly-enacted statutory norms to pending cases, and the application of newly-enacted statutory norms to prior conduct. *Landgraf,* —— U.S. at ——, ——, and ——, 114 S.Ct. at 1493, 1497, and 1499. The "unreasonable practice" provision of the 1993 Act, by its express terms, eliminates the latter retroactivity concern, as Congress has made it applicable to conduct occurring prior to September 30, 1990. The former retroactivity problem, however, remains, as nothing in the provision indicates whether it is to apply to cases pending as of the effective date of the 1993 Act. As it exhibited with respect to § 10701(f), Congress knows how to draft such a provision when desired; its failure to do so as part of the "unreasonable practice" provision of the 1993 Act strongly suggests that this provision was not intended to apply retroactively to cases already pending as of its date of enactment and, at any rate, fails to rebut the "deeply rooted" presumption against retroactive legislation recognized by the Supreme Court. *Landgraf,* —— U.S. at ——–——, 114 S.Ct. at 1497–98.

Admittedly, there seems little reason for Congress to distinguish between pending and non-pending undercharge claims regarding this provision, granting the right to bring an "unreasonable practice" counterclaim only in the latter circumstances. However, the Supreme Court has endorsed the following procedure for retroactivity analysis:

"When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party

possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result."

*Landgraf*, —— U.S. at ——, 114 S.Ct. at 1505. "Clear congressional intent" that the "unreasonable practice" provision of the 1993 Act is to apply retroactively to cases filed prior to its effective date is lacking; as a result, because this subsection substantively changes Jones' potential liability for reparations, it is inapplicable to the instant case. Therefore, the Court will not ask the ICC to determine whether Jones' attempt to enforce the filed rate doctrine despite its negotiated rate agreement with Marathon constitutes an "unreasonable practice" warranting set-aside of the filed rate doctrine.

### 4. *The Negotiated Rates Act of 1993 and the Bankruptcy Code:*

■ Contrary to Jones' contention, application of appropriate provisions of the 1993 Act does not limit the effect of the bankruptcy laws. Specifically, the 1993 Act indicates that nothing in it should be "construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy," Pub.L. No. 103–180, 107 Stat. 2053, § 9 (1993); 11 U.S.C. § 541(c)(1), in turn, states that "an interest of the debtor in property becomes property of the estate ... notwithstanding any provision in ... applicable nonbankruptcy law ... *that is conditioned on* the insolvency or financial condition of the debtor *and* that effects or gives an option to affect a forfeiture, modification, or termination of the debtor's interest in property." (Emphasis added). Jones claims that its right to collect undercharges pursuant to the filed rate doctrine constitutes an "interest in property"; therefore, because the provisions of the 1993 Act allow Marathon to, in effect, "subvert" its undercharge claim, the 1993 Act impermissibly gives Marathon an option to affect its property interest.

As an initial matter, it appears from the legislative history of the 1993 Act that § 9 was included primarily to assuage the fears of some Congressmen that the Act would infringe on the *jurisdiction* of the federal courts. Two Congressmen included the following statement in their comments on the NRA:

> "The amendment to section 9 of H.R. 2121 in the motion to suspend clarifies the committee's intention that H.R. 2121 does not affect the jurisdiction of the courts of the United States, including bankruptcy courts, to determine any matter regarding a bankrupt carrier ..."

139 Cong.Rec. H9593, H9597, H9598 (Nov. 15, 1993) (statements of Reps. Shuster and Petri). From this, we conclude that the purpose of Section 9 was *not* to limit the application of the 1993 Act to nonbankrupt carriers, but rather to ensure that "the courts in which the bankrupt carrier's estate is being adjudicated should continue to make all other determinations necessary to fully and finally wind up a bankrupt carrier's estate proceedings." *Id.*

Moreover, we do not believe that § 541(c)(1), in fact, conflicts with the 1993 Act. This argument was squarely addressed and rejected by the Honorable Thomas A. Higgins in *Jones Truck Lines, Inc. v. Aladdin Synergetics*, 174 B.R. 76 (M.D.Tenn. 1994):

> "Jones' assertion that Section 2(a) of the ["1993 Act"] [49 U.S.C. § 10701] conflicts with Section 541(c)(1) of the Bankruptcy Code is based on a misreading of these statutes. Section 2(a) provides for a statutory settlement of undercharge claims [as well as payment and liability schemes for contested claims], ... *provided that 'the carrier ... is no longer transporting property.'* ... In contrast, Section 541(c)(1) forbids any modification to a bankruptcy estate's interest in property that is '*conditioned on the insolvency or financial condition of the debtor.*' ... The plain language of [these] two statutes shows the absence of any conflict. The operation of Section 2(a) turns on whether the carrier is still transporting property whereas the operation of Section 541(c) depends on the financial status of the debtor. These two criteria are not the same."

*Id.* at 81, n. 9 (emphasis added). We agree with Judge Higgins and therefore reject the plaintiff's argument.

▮▮▮▮ Alternatively, even if we were to conclude that § 9 of the 1993 Act did, in fact, impermissibly infringe on § 541(c)(1), we would nevertheless reject the notion that the 1993 Act does not apply to bankrupt carriers. The Court acknowledges the fundamental canon of statutory interpretation: that the intention of Congress is best found in the plain language of the statute. Thus, if the language is plain, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) *quoting Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). The "plain language" of § 9, in turn, states that nothing in the 1993 Act "shall be construed as limiting or otherwise affecting" Chapter 11 bankruptcy laws, which would (arguably) occur if we rejected Judge Higgins' above-cited opinion. However, "in rare cases [where] the literal application of a statute will produce a result demonstrably at odds with the intention of the drafters ..., the intention of the drafters, rather than the strict language, controls." *Griffin v. Oceanic Contractors Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). Because the intention of Congress in this case is so clear, we are convinced that this would be one such "rare case."

It is clear that the entire purpose of the 1993 Act is to address the problem of bankrupt carriers attempting to recover undercharges from shippers. The legislative history of the bill is replete with references to this overreaching purpose. *See, e.g.,* S.Rep. 103–79, 1993 WL 241281 (June 29, 1993) ("The bill ... is intended to alleviate the freight motor carrier 'undercharge' litigation crisis by establishing a statutory procedure for resolving disputes resulting from efforts by *trustees for bankrupt motor carriers* ... to collect additional amounts for past transportation provided."); 139 Cong.Rec. H9593–02,

H9596 (Statement of Representative Rayhall) ("This dispute is framed within the context of efforts by the *trustees of failed trucking companies* to collect from shippers amounts arising out of the rate that was actually paid, and what is alleged to have been the applicable legal rate."); 139 Cong.Rec. H9593–02, H9596 (Statement of Representative Shuster) ("Quite simply, the undercharge crisis has been caused by *certain trustees of bankrupt trucking companies* repudiating the trucking company's own rates for past transportation services, and then trying to benefit from this unseemly practice in a bankruptcy proceeding."). Even those in Congress who opposed the bill did so on the ground that it should have permitted more collection of undercharges "so that the former employees of these *bankrupt carriers* can recover at least some of the back wages, severance, and vacation pay owed them, and unpaid contributions to pension and health and welfare plans." 139 Cong.Rec. H9593–02, H9596 (Statement of Representative Filner).

The vast majority of district courts presented with this same argument, often by Jones, have similarly concluded that the 1993 Act was indeed intended to apply to bankrupt carriers.[6] For example, Judge Higgins concluded:

"In a last ditch attempt to avoid the effects of the [1993 Act], Jones contends that the Act does not apply to bankrupt carriers [based on] [ ] Section 9 .... This Court finds little merit in Jones argument.

The interpretation urged by Jones is absurd and patently at odds with Congress' intent in enacting the [1993 Act] ... This Court construes the [1993 Act], consistent with Congress' intent, as applying to bankrupt carriers."

*Aladdin,* 174 B.R. at 80. *See also Jones Truck Lines, Inc. v. Afco Steel, Inc.,* 849 F.Supp. 1296, 1299 (E.D.Ark.1994) ("... the Court does not accept plaintiff's construction of the [1993 Act], [but instead] concludes that the basic reason for Congress' passage of the [1993 Act] was to address the problem that

---

**6.** While the Honorable Marvin R. Wooten, United States Bankruptcy Judge, has concluded that the 1993 Act is inapplicable to bankrupt carriers, *see In Re Bulldog Trucking, Langdon M. Cooper,*

*Trustee for Bulldog Trucking v. E.I. Du Pont De Nemours & Co.,* Adversary Proceeding No. 92–3100 (February 18, 1994), his is a minority position.

trustees for bankrupt carriers were pressing businesses all across the country for payments on shipments made years before").

Furthermore, as previously indicated, even assuming that sections 10701(f) and 11101(d) do, in fact, impermissibly intrude on the bankruptcy laws, and are therefore inapplicable in this case, the Court would nevertheless use its discretion to refer both the issues of tariff unreasonableness and Jones' motor carrier status to the ICC for an initial determination. For all of these reasons, then, the Court finds it appropriate to stay these proceedings pending ICC determination of the reasonableness of the tariff rate advanced by Jones, as well as its motor carrier status.

## 5. Other issues:

■ Finally, if the ICC determines that Jones acted as a motor common carrier but that its filed tariff rate was unreasonable, the Court also refers to the ICC the issue of the applicable alternative tariff rate. Because tariff construction and interpretation "is akin to the task of statut[ory] interpretations ... involv[ing] mainly questions of law," it is ordinarily assigned to the courts. *Coca–Cola Co. v. Atchison, Topeka and Santa Fe Ry. Co.*, 608 F.2d 213, 219 (5th Cir.1979). *See also Great N. Ry. Co. v. Merchants Elevator Co.*, 259 U.S. 285, 290–91, 42 S.Ct. 477, 478–79, 66 L.Ed. 943 (1922). However, when "ancillary factual determinations," such as the reasonableness or technical meaning of certain provisions, must be made in interpreting a particular tariff, the ICC must make such findings before the Court passes on tariff interpretation. *United States v. Railroad Co., Western Pacific*, 352 U.S. 59, 66–69, 77 S.Ct. 161, 166–67, 1 L.Ed.2d 126 (1956); *Coca–Cola*, 608 F.2d at 213. Thus, where "questions of construction and reasonableness are so intertwined that the same factors are determinative on both issues, then it is the Commission which must first pass on them." *Western Pacific*, 352 U.S. at 69, 77 S.Ct. at 167.

In this case, questions regarding the reasonableness of purported tariff rates and the technical provisions of such tariffs require the administrative expertise of the ICC before this Court can ultimately address tariff interpretation. According to the Supreme Court,

"[t]his conclusion is fortified by the artificiality of the distinction between the issues of tariff construction and of the reasonableness of the tariff as applied, the latter being recognized by all to be one for the Interstate Commerce Commission ... [T]he mere fact that the issue is phrased in one instance as a matter of tariff construction and in the other as a matter of reasonableness should not be determinative on the jurisdictional issue. To hold otherwise would make the doctrine of primary jurisdiction an abstraction to be called into operation at the whim of the pleader."

*Western Pacific*, 352 U.S. at 68–69, 77 S.Ct. at 167. Important technical issues in this case, including the procedures invoked by shippers to "trigger" filed rates, the range of available discounts under relevant tariffs, the interpretation of tariff provisions containing technical language or other terms of art, and the tariff rates typically charged in such circumstances, should be resolved by the ICC prior to tariff interpretation by this Court. While referral of such matters to the ICC for construction is not necessary "if that body, in prior releases or opinions, has already construed the particular tariff at issue or has clarified the factors underlying it," *Id.* at 69, 77 S.Ct. at 167, the Court has not been made aware of any such rulings in this case. As a result, because these issues are inextricably intertwined with the overriding question of applicability of the tariff rate advanced by Jones, they must be resolved by the ICC prior to any ruling by this Court.

## IV. SUMMARY

For the foregoing reasons, the Court hereby **GRANTS** the defendant's Motion for Stay and Referral to the ICC, and further court proceedings in the above-captioned matter, including the plaintiff's Motion for Summary Judgment, will be **STAYED** pending ICC determination of the reasonableness of the tariff rate sought by Jones, its motor carrier status, and the applicable tariff rate; during such time, this case shall be closed for statistical purposes, and may be reopened by either party after ICC resolution of such issues.

**SO ORDERED.**