In the Matter of LIFSCHULTZ FAST
FREIGHT CORPORATION,
Debtor.

Appeal of Bruce E. DE MEDICI,
Trustee for Lifschultz Fast
Freight Corporation.

No. 94–3661.

United States Court of Appeals,
Seventh Circuit.

Argued April 5, 1995.

Decided Aug. 18, 1995.

Robert B. Walker (argued), John T. Siegler, Shawn, Mann & Niedermayer, Washington, DC, for trustee-appellant.

William D. Brejcha, Abramson & Fox, Chicago, IL, Robert J. Gallagher (argued), M. Shields Gallagher & Gallagher, Northampton, MA, for appellee.

Before POSNER, Chief Judge, and CUMMINGS and MANION, Circuit Judges.

MANION, Circuit Judge.

Lifschultz is a common carrier that charged FDSI, one of its freight shipping customers, less than the freight rate it filed with the Interstate Commerce Commission. But under the "filed rate" doctrine a shipper is legally liable to the carrier for the rate filed with the Commission even if the carrier charged a lesser rate. Thus when Lifschultz went into bankruptcy, the Trustee, on behalf of the bankruptcy estate, sought to recover the difference between the filed rate and the charged rate. FDSI moved for summary judgment asserting that the Negotiated Rates Act of 1993 insulated small business concerns from liability for these so-called undercharges. The district court agreed and granted summary judgment for FDSI. The Trustee appeals and, for the reasons given below, we affirm.

## I. Background

Lifschultz is a common carrier and a debtor in bankruptcy. As a common carrier, Lifschultz is regulated by the Interstate Commerce Commission ("ICC") which administers the Interstate Commerce Act ("ICA"), 49 U.S.C. § 10101 et seq. Under the ICA, common carriers are required to file the freight rates they will charge for freight carriage. 49 U.S.C. § 10762. The regulatory regime created by the ICA requires those carriers to charge those filed rates, and only those rates, to customers. 49 U.S.C. §§ 10761 & 10762. Under the "filed rate" doctrine, the shipper is liable to pay the filed rate, even if a carrier negotiated and charged a lesser rate.

But there is, or at least was, a widespread practice whereby carriers negotiate and customers pay less than the freight rates filed with the ICC. The difference between the rate that common carriers filed with the ICC, and the lower rate negotiated and actually charged to shippers, is one type of so-called "undercharge." The lesser rates that Lifschultz negotiated and charged FDSI are called "negotiated rates."

Between 1987 and 1990 Lifschultz negotiated and charged FDSI rates lower than those filed with the ICC. In 1990 Lifschultz went into bankruptcy and the Trustee was appointed to administer Lifschultz's bankruptcy estate. As frequently happens, the Trustee ordered an audit and discovered the undercharges. The Trustee brought suit against FDSI to recover the undercharges

for the benefit of the bankruptcy estate. The merits were handled by the bankruptcy court, where FDSI moved for summary judgment. FDSI claimed that Section 2(a) of the Negotiated Rates Act ("NRA"),[1] codified at 49 U.S.C. § 10701(f), prohibited the Trustee from recovering undercharges because FDSI was a small business concern.[2] The bankruptcy court agreed with FDSI and recommended that the district court grant FDSI's motion for summary judgment. The district court did so. The Trustee appeals.

## II. Analysis

On appeal, the Trustee argues that the NRA does not apply to undercharge claims made by bankrupt carriers. In the alternative, he argues that if the NRA does apply to those claims, it violates the Bankruptcy Code. The Trustee's first argument rests on Section 9 of the NRA. Section 10701(f) lays out the procedures for resolving claims involving unfiled, negotiated rates. Section 9 of the NRA, however, states that the NRA will not limit the application of the Bankruptcy Code. The Trustee argues that applying § 10701(f) to undercharge claims made by bankrupt carriers limits or otherwise affects the application of the Bankruptcy Code to such claims, and therefore violates Section 9 of the NRA.[3] Similarly, the Trustee notes that a subsection of the NRA, found at § 10701(f)(9), exempts small business concerns from liability for undercharges. Thus, in the alternative, the Trustee argues that applying Section 2(a), § 10701(f)(9), to undercharge claims brought by a bankrupt carrier violates the antiforfeiture provisions of the Bankruptcy Code, 11 U.S.C. §§ 363(*l*) and 541(c)(1)(B). In order to sort out these confusing if not conflicting provisions of the NRA, we first need to examine how they became law.

### A. Statutory Background

The origin of the NRA has been described at length by other courts, so we will not recite all of the details here. *See generally Maislin Industries, U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990); *Reiter v. Cooper,* —— U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993); H.R.Rep. No. 103–359, 103 Cong., 1st Sess., p. 8 (1993), *reprinted at* 1993 U.S.C.C.A.N. 2534, 2535; S.Rep. No. 103–79, 103d Cong., 1st Sess. (1993); *In re Bulldog Trucking, Inc.,* 173 B.R. 517, 526–530 (W.D.N.C.1994). Suffice it to say that the Motor Carrier Act of 1980 significantly deregulated the trucking industry, causing an increase in competition. In an effort to preserve their market share, many carriers began to negotiate and charge rates lower than those filed with the ICC. When carriers that charged lower rates went bankrupt, bankruptcy trustees would usually attempt to recover undercharges for the benefit of the bankruptcy estate. To collect undercharges the trustees would pursue a three-pronged effort by challenging "negotiated rates," "coded rates," and "contract carriage rates" for various technical violations. *See generally,* S.Rep. No. 103–79, pp. 3–5 (1993); House Report 103–359, pp. 8–9, 1993 U.S.C.C.A.N. 2535–2536; *White v. United States,* 989 F.2d 643, 646–47 (3d Cir.1993). But their main focus was on negotiated rates which were illegal simply because they had not been filed as required by the ICA. Here, the trustee would claim that shippers must now pay the legal (and higher) rate filed with the ICC under the filed rate doctrine.

In response to these claims, shippers advanced "unreasonable practice" and "unreasonable rate" defenses. The shippers' "unreasonable practice" defense was actually promoted by the ICC (and called its "Negotiated Rates Policy") in order to prevent carriers from recovering negotiated rate undercharges. Thereby the ICC took the position that a carrier that attempted to collect a filed rate after having negotiated a lesser rate engaged in an "unreasonable practice" that violated 49 U.S.C. § 10701(a). In *Maislin,*

---

**1.** The Negotiated Rates Act of 1993, P.L. 103–180, 107 Stat. 2044–2053 (1993).

**2.** The Trustee has never contested that FDSI is a small business concern within the meaning of 49 U.S.C. § 10701(f)(9).

**3.** Section 9 of the Negotiated Rates Act was not codified, but Section 9 can be found at 107 Stat. 2044, 2053 (1993).

*supra,* the Supreme Court struck down the ICC's Negotiated Rates Policy on the grounds that it violated the statutory duty created by the ICA to charge filed rates. At the same time, however, the Court implicitly confirmed the shippers' unreasonable rate defense by leaving open the question of how a shipper's right to damages caused by unreasonable rates under 49 U.S.C. § 11705(b)(3) might affect undercharge claims. *Maislin,* 497 U.S. at 129 n. 10, 110 S.Ct. at 2767 n. 10.

Later in *Reiter,* the Supreme Court held that shippers could assert the statutory claim for damages caused by unreasonable rates as a counterclaim in an undercharge action. *Reiter,* —— U.S. at ——, ——, 113 S.Ct. at 1219, 1221. However, the Court also held that neither the ICA nor the doctrine of primary jurisdiction required that an unreasonable rate claim/defense be filed with, and determined by, the ICC before an undercharge action could be filed in federal court. *Id.* Therefore, the Court concluded, federal courts had discretion to award judgment on an undercharge claim pursuant to Fed. R.Civ.P. 54(b) before an unreasonable rate counterclaim/defense was resolved by the ICC. As *Reiter* illustrates, for obvious reasons shippers wished to avoid paying undercharge claims to bankrupt carriers while their unreasonable rate defense was still pending.

The Supreme Court's holding in *Maislin* began the process that culminated in Congress' enactment of the NRA, and there is no doubt that its drafters intended it to address undercharge claims brought by bankrupt carriers. *See* S.Rep. 103–79, pp. 5–6 (for efforts to pass undercharge legislation in the wake of *Maislin* ). References to bankrupt carriers dominate the House and Senate reports, *see* House Report 103–359, S.Rep. No. 103–79. And the NRA, as enacted into law, addresses each of the principal undercharge theories described earlier. With respect to negotiated rate undercharge claims, the NRA creates three classes of undercharge claims and provides that if a shipper pays a fixed percentage of their value, then the undercharge claim is deemed satisfied. *See* 49 U.S.C. § 10701(f)(2), (3) & (4). Significantly, theses provisions of the NRA apply only to undercharge claims brought by carriers described in § 10701(f)(1)(A),[4] and that class of carriers is almost wholly comprised of bankrupt carriers. The NRA also bars certain types of undercharge claims against small business concerns. *See* § 10701(f)(9). And it addresses the *Reiter* decision by staying the payment of undercharge claims pending the ICC's determination of any unreasonable rate counterclaim/defense, *see* § 10701(f)(6), and requiring federal courts to refer specific undercharge claims and related issues to the ICC. *See* Sec. 2(a), § 10701(f)(1)(B)(v) & (f)(6), Sec. 2(e)(2), and Sec. 8.[5]

## B. Proper Construction of Section 9 of the NRA

■ Despite the NRA's apparent focus on the undercharge claims of bankrupt carriers, the Trustee argues that applying the Act to such claims violates Section 9 of the NRA.

---

**4.** (f) PROCEDURES FOR RESOLVING CLAIMS INVOLVING UNFILED, NEGOTIATED TRANSPORTATION RATES.—

(1) In general—When a claim is made.... by a party representing [a motor carrier] regarding the collection of rates or charges for such transportation in addition to those originally billed an collected by the carrier or freight forwarder for such transportation, the person against whom the claim is made may elect to satisfy the claim under the provisions of paragraphs (2), (3), or (4) of this subsection, upon a showing that—

(A) *the carrier or freight forwarder is no longer transporting property or is transporting property for the purpose of avoiding the application of this subsection; and....*

**5.** In fact the ICC was frustrated by the refusal of courts to refer these matters to it pursuant to the doctrine of primary jurisdiction. *See Ex Parte No. MC–177, Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates,* 5 I.C.C.2d 623 (1989). *See also Jones Truck Lines, Inc. v. AFCO Steel, Inc.,* 849 F.Supp. 1296, 1303–07 (E.D.Ark.1994); *Bulldog Trucking,* 173 B.R. at 532–33 (bankruptcy court states that undercharge-related issues are simple, do not require the ICC's expertise, and therefore, it has never referred an undercharge-related issue to the ICC for determination); *cf. In re Jones Truck Lines, Inc.,* 177 B.R. 606, 614 (E.D.Wis.1995) ("[B]ecause Congress has removed from this Court discretionary authority in determining the reasonableness of tariff rates [under § 10701(f)(6) ] ... this court is compelled to stay this matter pending an ICC ruling on such issue....").

According to the Trustee, when the NRA is applied to prevent bankrupt carriers from recovering undercharges, it limits and otherwise affects the application of the Bankruptcy Code to undercharge claims in violation of Section 9. Section 9 of the NRA provides:

> Sec. (9) LIMITATION ON STATUTORY CONSTRUCTION.
>
> Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to the jurisdiction of the courts of the U.S. (including bankruptcy courts); or [ERISA].

The bankruptcy and district courts rejected the Trustee's argument. They found that applying Section 2(a) of the NRA, § 10701(f)(9), to Lifschultz's undercharge claims did not violate the antiforfeiture provisions of the Bankruptcy Code and therefore did not violate Section 9.

Section 9 of the NRA is susceptible to two interpretations. One reading is that offered by the Trustee: Section 9 means the NRA should not affect the treatment of undercharge claims under the Bankruptcy Code or ERISA.[6] The other reading is that offered by Lifschultz and adopted by the courts below: Congress crafted the NRA to address undercharge claims brought by bankrupt carriers but without interfering with the Bankruptcy Code or ERISA; Section 9 means that if those laws come into conflict, the NRA must give way. The language of Section 9 appears to be broad but, as FDSI has shown, reading Section 9 broadly severely undercuts Section 2(a), § 10701(f)(1)(A), which creates a class almost wholly composed of bankrupt carriers. Because these provisions appear to conflict, it would be helpful to examine the NRA's legislative history. *See Primate Protection League v. Tulane Educ. Fund,* 500 U.S. 72, 84, 111 S.Ct. 1700, 1707–08, 114 L.Ed.2d 134 (1991) (recourse to legislative history is appropriate where proffered interpretation of a statute would compel an odd result); *Merrill Lynch, Pierce, Fenner & Smith, Inc. et al. v. Lauer,* 49 F.3d 323, 326–27 (7th Cir.1995) (we look beyond express language of statute only where such language is ambiguous, or where a literal interpretation would lead to absurd results or thwart the goals of the statutory scheme).

*1. Legislative history of Section 9.*

As noted, the Supreme Court's holding in *Maislin* began the process that culminated in the NRA. The drafters of that Act intended it to address undercharge claims brought by bankrupt carriers. For example, the House Report that recommended passage of the NRA in 1993 stated:

> The purpose of H.R. 2121, as reported, is to provide a statutory process for resolving disputes for claims involving negotiated transportation rates brought about by Trustees for non-operating motor carriers for past transportation services. The bill provides a procedure for settlement of such claims, as well as a statutory mechanism for certain other transportation regulatory changes.

House Report 103–359, p. 7–8, U.S.C.C.A.N. 1993, pp. 2534–35. The Senate report for its version of the NRA likewise stated:

> The bill, as reported, is intended to alleviate the freight motor carrier "undercharge" litigation crisis by establishing a statutory procedure for resolving disputes resulting from efforts by Trustees for bankrupt motor carriers or nonhousehold goods forwarders to collect additional amounts for past transportation.

. . . . .

S.Rep. No. 103–79. Indeed, references to bankrupt carriers dominate the House and Senate reports. The class of carriers created by Section 2(a), § 10701(f)(1)(A), is almost wholly comprised of bankrupt carriers, and the Act addresses each of the principal undercharge theories advanced by trustees.[7]

---

6. Under 29 U.S.C. § 1368(a), where an employer becomes liable to the Pension Guaranty Corporation under §§ 1362, 1363, or 1364 of ERISA, a lien arises "upon all property and rights to property whether real or personal, belonging to such employer(s)."

7. *See* Sections 2(a), 2(e), and Section 5 and Section 8 for the NRA's treatment of the other undercharge claims and defenses noted earlier.

Thus, it is certain that the NRA was originally drafted to resolve undercharge claims made by bankrupt carriers—at least initially.

But the Trustee argues that Section 9 was a key compromise which shows that the NRA does not limit the Bankruptcy Code. And a review of the hearings held in the House of Representatives concerning the NRA does indicate that the interplay between the NRA, the Bankruptcy Code, and ERISA was a focal point of the legislative process. *See generally The Negotiated Rate Issues and Proposed Legislative Solutions Thereto,* Hearing before the Subcommittee on Surface Transportation of the House Committee on Public Works and Transportation, 103d Cong., 1st Sess. (1993). Proponents of the NRA regarded undercharge claims as an economically debilitating business practice and believed it was fundamentally unfair for carriers to recover undercharges after they had negotiated lower rates. Their opponents were organized labor and the trustees for employee pension plans. These groups argued that just like the shippers, they were the victims of carriers who failed to pay wages, payroll taxes, contributions to pension and welfare funds and/or termination or withdrawal payments. For those reasons, they argued, any effort to eliminate the undercharge crisis had to offer special protections to employees and employee ERISA funds. As a result of these disparate interests, two rival versions of undercharge legislation were offered for consideration by the House of Representatives in 1993: H.R. 2021 and H.R. 2121.[8] But ultimately it was H.R. 2121, the version favored by shippers (and which is almost identical to the now-enacted NRA) that was reported out favorably by the Committee on Public Works and Transportation. The bill was reported out for consideration by the House after efforts to amend the bill in Committee failed. See 139 Cong. Rec.H. 9601 (November 15, 1993) (remarks of Rep. Lipinski).

According to the Trustee, the reporting of H.R. 2121 out of Committee explains the origin of Section 9, and the legislative history shows that Section 9 means the NRA does not apply to undercharge claims made by bankrupt carriers. We do know that on November 15, Chairman Mineta wrote to Chairman Brooks as follows:

Because of your Committee's jurisdiction over Federal courts and bankruptcy, I recognize your right to request a sequential referral of H.R. 2121. However, and in accordance with your letter, I am pleased that we were able to agree on language clarifying that we do not intend in this legislation to affect[ ] either the Bankruptcy Code or the jurisdiction of the bankruptcy courts. Based on our agreement, it is my understanding that you will not pursue your request for a sequential referral.

Letter of Hon. Norman Y. Mineta, Chairman, House Committee on Public Works and Transportation to Hon. Jack Brooks, Chairman, House Committee on the Judiciary (November 15, 1993), *reported in* House Report 103–359, p. 16. That same day, Chairman Brooks replied:

.... As you know, under Rule X of the Rules of the House of Representatives, our Committee has jurisdiction over "bankruptcy" and "Federal Courts." Based on this jurisdiction, we are concerned that H.R. 2121, as currently drafted, could be construed to limit or otherwise affect application of Title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts). On the basis of these concerns and others, our Committee has requested a sequential referral of the bill.

However, it is my understanding that as a result of staff discussions on this issue, amended language will be included in the version of H.R. 2121 to be called-up on suspension that will make it clear that nothing in the bill shall be construed as limiting or otherwise affecting application

---

8. A third bill, H.R. 1701, was drafted for the consideration of the House in 1993, but that version of the NRA does not figure prominently in the legislative process because its provisions were included in H.R. 2121 with one change not relevant here. *See The Negotiated Rate Issues*

*and Proposed Legislative Solutions Thereto,* Hearing before the Subcommittee on Surface Transportation of the House Committee on Public Works and Transportation, 103d Cong., 1st Sess. p. IX. (1993). The text of H.R. 2021 or H.R. 2121 is set out in the Committee print.

of Title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts).

Based on these assurances, such a change in statutory language would also create circumstances whereby the Judiciary Committee would withdraw its request for sequential referral. . . .

Letter of Hon. Jack Brooks, Chairman, House Committee on the Judiciary to Hon. Norman Y. Mineta, Chairman, House Committee on Public Works and Transportation (November 15, 1993), *reported in* House Report 103–359, pp. 16–17.

The floor discussion of the NRA which followed certainly illustrates why legislative history is notoriously unreliable. For the most part, the Representatives addressed H.R. 2121 as if Section 9 did not exist. The few Representatives that did address Section 9 were those who were intimately involved with the events described above, and their remarks are most charitably described as tendentious.[9] Whatever the case, after a brief floor discussion H.R. 2121 was passed by the House of Representatives, 139 Cong. Rec.H. 9657, 9659 (November 15, 1993). Three days later the House version of the bill, which was substituted for the text of S. 412, *see Congressional Record Digest*, 139 Cong.Rec. D1302, was approved by the Senate. 139 Cong.Rec. S16187 (November 18, 1993).[10]

### 2. *Construction of Section 9.*

To date approximately 50 courts have considered whether Section 9 prohibits the application of the NRA to undercharge claims brought by bankrupt carriers. Given the text of Section 9 and the legislative history of the NRA, it is no surprise that courts have produced the wide variety of views concerning the proper construction of Section 9 and the effect of the NRA upon undercharge claims made by bankrupt carriers.[11] And we can see why. Ultimately, the question boils down to whether Section 9 should be read broadly or narrowly, *see, e.g., In re Jones Truck Lines, Inc.*, 57 F.3d 642, 645 (8th Cir.1995). If Section 9 is read broadly it means the NRA cannot limit or eliminate undercharge claims made by bankrupt carriers. If Section 9 is read narrowly it means that the NRA does apply to such claims. The NRA would be restricted only when it comes into a direct conflict with the Bankruptcy Code. For one trying to choose the proper reading of Section 9, the legislative history provides no clear guidance. So after reviewing the legislative history we are left where we started: we have an Act directed almost exclusively towards the undercharge claims of bankrupt carriers and a last minute amendment that, if read broadly, effectively nullifies the Act. Under these circumstances, it is not surprising that the vast

**9.** See Appendix A of this opinion for the remarks relating to Section 9.

**10.** The final version of the NRA represents a compromise between H.R. 2121 and S. 412, the Undercharge Equity Act of 1993, which provided that claims involving shipments of 10,000 pounds or less could be satisfied upon payment of 20% of the undercharge, claims involving shipments of 10,000 pounds or more could be satisfied upon payment of 10% of the undercharge, and that claims against small business concerns or charitable organizations were totally barred. *See* Sen.R. 103–79 for the text of S. 412.

**11.** *Cf. In re Maislin Industries, U.S., Inc.*, 176 B.R. 436 (Bankr.E.D.Mich.1995) (Section 9 provides that Bankruptcy Code controls NRA, but NRA does not violate the antiforfeiture provisions of the Code, and therefore does not violate Section 9); *cf. In re Jones Truck Lines*, 172 B.R. 602 (Bankr.W.D.Ark.1994) (applying NRA to undercharge claims made by bankrupt carriers does not violate Section 9 but does violate the antiforfeiture provisions of the Bankruptcy

Code); *cf. In re Parker Refrigerated Service, Inc.*, 173 B.R. 704 (Bankr.W.D.Wash.1994) (applying NRA to undercharge claims made by bankrupt carriers does not violate Section 9 but would violate the antiforfeiture provisions of the Bankruptcy Code, therefore the NRA, as the latter and more specific statute, should be considered controlling); *cf. Matter of Brown Transport*, 176 B.R. 82 (Bankr.N.D.Ga.1994) (applying NRA to undercharge claims made by bankrupt carriers does not violate Section 9 of the Act or the antiforfeiture provisions of the Bankruptcy Code); *cf. In re Americana Expressways, Inc.*, 172 B.R. 99 (Bankr.D.Utah 1994) (reading Section 9 to preclude its application to bankruptcy proceedings because it comports with plain meaning of section and avoids any alleged constitutional defect). *See, e.g., In re Bulldog Trucking*, 173 B.R. 517 (W.D.N.C.1994) (applying NRA to undercharge claims made by bankrupt carriers violates Section 9 of the NRA and the antiforfeiture provisions of the Bankruptcy Code).

majority of courts have held that Section 9 does not preclude application of the NRA to undercharge claims brought by bankrupt carriers. After we heard oral argument in this case, the Eighth Circuit joined that majority in an opinion that addresses the identical issues before us. *Jones Truck Lines, Inc., id.* The court held that applying § 10701 to undercharge claims made by bankrupt carriers does not violate the Bankruptcy Code or Section 9. The Eighth Circuit is the first circuit to have addressed this issue.

■■■ Because this case presents an issue of statutory interpretation, "[o]ur task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Negonsott v. Samuels,* —— U.S. ——, ——–——, 113 S.Ct. 1119, 1122–23, 122 L.Ed.2d 457 (1993) (quotations omitted). The statutory text is the best evidence of a statute's purpose, *West Virginia Univ. Hospitals, Inc. v. Casey,* 499 U.S. 83, 98, 111 S.Ct. 1138, 1146–47, 113 L.Ed.2d 68 (1991), and "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Thus, we have a duty to "give effect, if possible, to every clause and word of a statute." *Moskal v. United States,* 498 U.S. 103, 109–110, 111 S.Ct. 461, 466, 112 L.Ed.2d 449 (1990) (internal quotations omitted). However, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *U.S. Nat. Bank of Or. v. Independent Ins. Agents,* —— U.S. ——, ——, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993) (internal quotations, brackets and citations omitted). "Statutory construction is a holistic endeavor and, at a minimum we must account for a statute's full text, language as well as punctuation, structure, and subject matter." *Id.* Therefore, we have a "deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment." *Pa. Dept of Public Welfare v. Davenport,* 495 U.S. 552, 562, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990).

Established canons of statutory construction lead us to conclude that the Trustee's broad reading of Section 9 is incorrect. For one thing, if we read broadly the parts of Section 9 dealing with jurisdiction, several of the NRA's stay and referral provisions are rendered totally void. For example, Section 2(a), § 10701(f)(6), contains a mandatory stay and referral provision pending an ICC determination as to the reasonableness of the carrier's filed rate. That provision limits the power a federal court would otherwise have to render judgment on undercharge claims consistent with *Reiter, supra,* and takes away a court's discretion to determine undercharge claims and related issues without referral to the ICC. Indeed that was the whole purpose of these stay and referral provisions. But if nothing in the NRA can affect the jurisdiction of the federal courts, then this provision is totally void. The same would be true for Sections 2(a), § 10701(f)(1)(B)(v), 2(e)(2), 2(g), and Section 8 of the NRA. Understandably, we have a "deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment." *Pa. Dept of Public Welfare,* 495 U.S. at 562, 110 S.Ct. at 2133. For the same reason, when forced to choose between specific substantive provisions and a general savings clause, we choose the more specific provisions because we believe they express congressional intent more clearly. *See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 379, 384–85, 112 S.Ct. 2031, 2034, 2037, 119 L.Ed.2d 157 (1992), citing *International Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 812, 93 L.Ed.2d 883 (1987) ("We do not believe Congress intended to undermine this carefully drawn statute through a general savings clause."); *see also* Norman J. Singer, *Sutherland Statutory Construction,* §§ 47.08–11 (5th Ed.1995) (resolve doubts about the scope of statutory provisions and exceptions against those provisions). Therefore, these more specific stay and referral sections must prevail over the general language of Section 9 that refers to jurisdiction.

These same principles indicate that we should also read narrowly the language in Section 9 concerning Title 11 and ERISA.

*Cf. Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 478–80, 112 S.Ct. 2589, 2596, 120 L.Ed.2d 379 (1992). Specifically, a broad reading of Section 9's reference to the application of the Bankruptcy Code will all but eviscerate the NRA. The class of carriers and claims treated by the Act is almost entirely comprised of bankrupt carriers. *See* Sections 2(a), § 10701(f), and 2(e). Also, if Section 9 is read broadly, the result will be two bodies of law relating to undercharge claims. For example, Section 3 of the NRA amends 49 U.S.C. § 11706(a)(b) & (d) by changing the statute of limitations governing claims for charges or overcharges. If Section 9 is read to preclude the application of this amendment to undercharge claims coming within the scope of the bankruptcy court or ERISA, then there will be two different limitation periods governing such claims. There are other provisions that would create similar anomalies.[12] All of these results would surely be very odd. We thus conclude that we must defer to the more specific statutory sections rather than override them with a very broad application of Section 9. *Cf. Primate Protection League,* 500 U.S. at 84, 111 S.Ct. at 1707–08. However, reading Section 9 narrowly will not render it superfluous. Even under this narrower reading, if there is a conflict between the provisions of the NRA and the Bankruptcy Code's antiforfeiture provisions or the ERISA lien, then Section 9 indicates that the NRA should yield. *See, e.g., In re Maislin Industries, U.S., Inc.,* 176 B.R. 436 (Bankr.E.D.Mich. 1995) (Section 9 provides that Bankruptcy Code controls NRA, but NRA does not violate the antiforfeiture provisions of the Code, and therefore, does not violate Section 9). In fact, other courts have held that the NRA trumps the Code in cases of direct conflict. *In re Parker Refrigerated Service, Inc.,* 173 B.R. 704, 716 (Bankr.W.D.Wash.1994) (apply-

ing NRA to undercharge claims of bankrupt carrier would violate the antiforfeiture provisions of the Bankruptcy Code, but NRA, as more recent and specific enactment, prevails over the Code); *see also In re Americana Expressways,* 177 B.R. 960, 966 (D.Utah 1995) (adopting this view).

■ We conclude that we must read Section 9 narrowly. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain,* 503 U.S. at 253–54, 112 S.Ct. at 1149. And when we are forced to choose between specific statutory provisions and a general savings clause, we err on the side of the specific provisions in the belief that they reflect congressional intent more clearly. *See International Paper Co. v. Ouellette,* 479 U.S. at 494, 107 S.Ct. at 812–13. Absent a clearly expressed intention contrary to those more specific provisions, *see Consumer Product Safety Com'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), we simply cannot "believe Congress intended to undermine this carefully drawn statute through a general savings clause," *see International Paper,* 479 U.S. at 494, 107 S.Ct. at 812, consistent with our duty to "make sense rather than nonsense of the corpus juris." *West Virginia Univ. Hospitals, Inc. v. Casey,* 499 U.S. at 101, 111 S.Ct. at 1148. Therefore we conclude that Section 9 does not override the NRA and that the NRA does apply to the undercharge claims in question.

**C. Proper Construction of Section 2(a) of the NRA**

■ Having found that the NRA applies to undercharge claims made by bankrupt carriers, we next examine Section 2(a) of the

---

**12.** For example, Section 4(a) amends 49 U.S.C. § 11712(c) and authorizes the ICC to establish rules under which the tariff requirements of §§ 10761 and 10762 will not apply to overcharge or undercharge claims that are settled by mutual consent. Section 5 amends 49 U.S.C. § 10762 to create requirements with respect to coded accounts and range tariffs. Section 6 amends 49 U.S.C. § 10702 to create certain requirements governing the contracts of motor contract carriers and provides penalties for violations of these

provisions. Section 7 amends Subchapter IV of chapter 107 of title 49, to add a new section governing billing and collecting practices. If Section 9 means that none of these amendments created by the NRA limits or otherwise affects claims that come within the scope of the Bankruptcy Code or ERISA, then there will be two bodies of law governing these claims depending upon whether the undercharge claims come within the scope of the Bankruptcy Code or ERISA.

NRA, 49 U.S.C. § 10701(f) to address the Trustee's claim that the application of the NRA violates the antiforfeiture provisions of the Bankruptcy Code.[13] In general § 10701(f) creates three classes of undercharge claims and provides that if a shipper pays a fixed percentage of their value, then the undercharge claim is deemed satisfied. *See* § 10701(f)(2), (3) & (4). In order for these settlement options to apply, however, certain conditions must be satisfied; those conditions are set forth in § 10701(f)(1). However, apart from allowing discounted settlements on certain claims, § 10701(f) completely eliminates liability on some types of undercharge claims. *See* § 10701(f)(9). The question here is whether the conditions set forth in subsection (f)(1)(A) must be satisfied in order to employ the bar on claims created by subsection (f)(9). That is, we must decide whether the statute unconditionally extinguishes a small business concern's liability to pay undercharges or whether that dispensation is reserved only for those claims by carriers that are no longer transporting property, or are transporting property for the purpose of avoiding § 10701(f).

On appeal, the Trustee asserts that the district court erred when it concluded that the limiting conditions for carriers set forth in (f)(1)(A) did not apply to subsection (f)(9). The Trustee argues that when subsection § 10701(f) is read properly a carrier must meet the threshold criteria set forth in subsection (f)(1)(A) in order to obtain the exemption from undercharge suits contained in subsection (f)(9). If the Trustee's reading of § 10701(f) is correct, it would mean that the bar on undercharge claims against shippers created by subsection (f)(9) applies only where the claim is made by a carrier that is non-operating or that is operating to avoid the effect of § 10701(f). Assuming that interpretation, the Trustee maintains that a non-operating carrier is almost always bankrupt. The Trustee next argues that applying the dispensation under (f)(9) to undercharge claims brought by bankrupt carriers violates the antiforfeiture provisions of the Bankruptcy Code, 11 U.S.C. §§ 363(*l*) and 541(c)(1)(B). According to the Trustee, the conditions set forth in § 10701(f)(1)(A) make the operation of § 10701(f)(9), which in this case extinguishes undercharges as property of the estate, contingent on the financial condition (as opposed to operating condition) of the carrier bringing the undercharge claim. Therefore, he argues, applying § 10701(f)(9) violates the antiforfeiture provisions which, generally speaking, trump any law that is triggered by the insolvency of the debtor and diminishes the bankruptcy estate. *See* 11 U.S.C. §§ 363(*l*) and 541(c)(1)(B).

The Trustee's argument hinges on his reading of the statute, and that argument rests on two supports. First, the Trustee relies on the "In General" heading at the beginning of section (f)(1). Here, the Trustee argues that the "In General" heading in subsection (f)(1) indicates that it applies to all of the following subsections, including (f)(9). The Trustee also argues that reading (f)(9) independently of (f)(1)(A) contradicts the "Notwithstanding paragraphs (2), (3), and (4) ..." language in subsection (f)(9). According to the Trustee, since subsection (f)(9) expressly provides that it operates notwithstanding only (f)(2), (f)(3), and (f)(4), then by necessary implication subsection (f)(1) does apply to subsection (f)(9).

After carefully reviewing the statute and the legislative history, we conclude that the conditions set forth in (f)(1)(A) do not apply to subsection (f)(9). First, and most importantly, we are convinced that Congress did not intend to limit the application of (f)(9) to undercharge claims made by carriers described in (f)(1)(A). Where Congress intended to reference this limitation, it did so. *See, e.g.,* Section 2(a), § 10701(f)(6);[14] Section 2(g).[15]

---

13. See Appendix B of this opinion for the full text of § 10701(f).

14. (6) STAY OF ADDITIONAL COMPENSATION.—When a person proceeds under this section to challenge the reasonableness of the legally applicable freight rate or charges being claimed **by a carrier or freight forwarder described in paragraph (1)** in addition to those already billed and collected, the person shall not have to pay any additional compensation to the carrier or freight forwarder until the Commission has made a determination as to the reasonableness of the challenged rate as applied to the freight of the person against whom the claim is made.

15. (g) RATE REASONABLENESS.—Section 10701(e) of title 49, United States Code, is

This reading of the statute also jibes with the structure of § 10701(f) and the "Notwithstanding" language in subsection (f)(9). Subsections (f)(2), (f)(3) & (f)(4) describe classes of undercharge claims and set a percentage of the claim that, if paid by the shipper, *satisfies* the claim. 49 U.S.C. § 10701(f)(1)(B)(v). In contrast, subsection (f)(9) is not a settlement option; it is an absolute bar on the class of undercharge claims created therein. That total bar operates notwithstanding the more limited settlement options set forth in (f)(2), (f)(3), and (f)(4). For this reason, where (f)(1) links the conditions set forth in (f)(1)(A) to subsections (f)(2), (f)(3), and (f)(4), the statute is addressing the *satisfaction* of valid undercharge claims under those subsections. But that portion of the statute does not apply to the total *bar* on claims provided separately by subsection (f)(9). The "In General" heading at the beginning of (f)(1) does not require a different result because the general rule created by § 10701(f) is the *satisfaction* of undercharge claims; the total *bar* on claims created by (f)(9) is an exception to the general rule. Finally, subsection (f)(7) is an example of where Congress specifically intended to treat subsection (f)(9) and subsections (f)(2), (f)(3) & (f)(4) together. It did so by listing the subsections together in the paragraph under (f)(7). *See Matter of Best Refrigerated Exp., Inc.,* 168 B.R. 978, 984–85 (Bankr.D.Neb.1994). "Had Congress intended the 'no longer transporting property' clause of (f)(1)(A) to apply to (f)(9), the small business concern paragraph, it would have listed paragraph (9) with (2), (3) and (4) under 10701(f)(1), as it did under 10701(f)(7)." *Id.*

The legislative history also supports this reading of the statute. The House Report on the NRA indicates that subsection (f)(9) is intended to create an "amnesty" regarding undercharge claims described therein, *see* House Report 103–359, p. 10, and the section-by-section summary restates this intent.

*Id.* at p. 12. The House Report, like the statutory language, also links the conditions set forth in (f)(1)(A) & (B) to the *settlement* of claims. *Id.* at pp. 11–12. And the legislative history, like the statutory language and structure, belies any claim that the bar created by (f)(9) applies only where the settlement options listed in subsections (f)(2), (f)(3), and (f)(4) would apply. The unsuccessful Senate version of the NRA expressly referenced subsection (f)(1)(A) in the text of its analogue to subsection (f)(9), *see North Penn Transfer, Inc. v. ATD–American Co.,* 175 B.R. 168, 170 n. 1 (E.D.Pa.1994) (and legislative materials cited therein), and so did a prior version of the legislation. *See* Senate Committee on Commerce, Science, and Transportation, Report on S. 1675, the Undercharge Equity Act of 1992, S.Rep. No. 102–359, 102 Cong., 2d Sess., (1992) pp. 2, 10, 15. But these drafts did not become law. In contrast, the final version of the NRA enacted by Congress does not reference the provisions of (f)(1)(A) in subsection (f)(9). This significant and clearly deliberate omission defeats any claim that the bar created by subsection (f)(9) only operates with respect to claims brought by a carrier that satisfies the conditions set forth in subsection (f)(1)(A).

Thus, we conclude that the conditions set forth in 49 U.S.C. § 10701(f)(1)(A) need not be satisfied in order for a shipper to enjoy the immunity from undercharge claims provided by § 10701(f)(9). *See In re: Jones Truck Lines, Inc.,* 57 F.3d at 647–49; *Matter of Brown Transport Truckload,* 176 B.R. 82, 86 (Bankr.N.D.Ga.1994) (citing cases). The operation of § 10701(f)(9) does not violate the antiforfeiture provisions of the Bankruptcy Code. The conditions set forth in subsection (f)(1)(A) do not make the operation of § 10701(f)(9) contingent on the financial condition of the carrier/debtor bringing an undercharge claim.

The Negotiated Rates Act was designed to limit the undercharge recovery of bankrupt companies. Section 9, a last-minute amend-

---

amended by adding at the end the following: "Any complaint brought against a motor carrier **(other than a carrier described in subsection (f)(1)(A))** by a person (other than a motor carri-

er) for unreasonably high rates for past or future transportation shall be determined under this subsection."

ment to the Act, declared the NRA should not limit the application of the Bankruptcy Code or ERISA. We conclude that Section 9 means the NRA is overridden if it comes into a direct conflict with the Bankruptcy Code or ERISA. In so doing, we avoid reading Section 9 out of the statute, but also prevent it from rendering several more specific provisions of the NRA superfluous; and we prevent a general savings clause from undermining, if not nullifying, the whole statute. We also conclude that there is no direct conflict between the NRA and the Bankruptcy Code in this case. Under Section 2(a) of the NRA, § 10701(f)(9), small business concerns like FDSI are exempt from liability for undercharge claims. Since the small business exemption is unconditional, there is no colorable argument that it violates the antiforfeiture provisions of the Bankruptcy Code or Section 9 of the NRA.

For the foregoing reasons, we affirm the district court.

### Appendix A

Only four Representatives addressed Section 9. The first speaker was Rep. Schuster, a leading sponsor of the NRA on the House Committee for Public Works and Transportation. He addressed the meaning of Section 9 as follows:

> I would like to comment on one section of the bill in particular. The amendment to section 9 of H.R. 2121 in the motion to suspend clarifies the committee's intention that H.R. 2121 does not affect the jurisdiction of the courts of the United States, including bankruptcy courts, to determine any matter regarding a bankrupt carrier, other than determinations statutorily required by H.R. 2121 to be resolved by the ICC. The obligation of the court or bankruptcy court to refer any of these determinations to the ICC in accordance with this statute is mandatory and not discretionary. The committee intends in section 9 that the courts in which the bankrupt carrier's estate is being adjudicated should continue to make all other determinations necessary to fully and finally wind up a bankrupt carrier's estate proceedings.

103 Cong.Rec. H9597 (Nov. 15, 1993) (remarks of Rep. Schuster). Remarkably, Representative Petri made the same statement, verbatim, a moment later. 103 Cong.Rec. H9598 (Nov. 15, 1993) (remarks of Rep. Petri). The next speaker to address Section 9 was Representative Mineta, who stated:

> Finally, Mr. Speaker, I would note that we have made a few technical and clarifying amendments to the bill today. Among them, we are clarifying in section 9 of the bill that we do not intend in this legislation to affect either the Bankruptcy Code or the jurisdiction of the bankruptcy courts, matters over which our committee does not have jurisdiction. At present, when a carrier is in bankruptcy, and when in the course of bankruptcy proceedings an issue arises over which the ICC has particular expertise, the court typically refers that issue to the ICC pursuant to the doctrine of primary jurisdiction. The ICC decides that particular issue, and the ICC's decision is then incorporated by the court into the overall adjudication of the bankruptcy case. Nothing in this legislation would alter the current statutory framework which established the respective jurisdiction of the courts and the ICC.

103 Cong.Rec. H9603 (remarks of Rep. Mineta). Last up was Rep. Brooks, who was responsible for the inclusion of Section 9. He stated:

> Mr. Speaker, as Mr. Mineta has noted, the Committee on the Judiciary had earlier expressed concern that H.R. 2121, the Negotiated Rates Act of 1993, as ordered reported by the Committee of Public Works and Transportation, could have been construed to limit the jurisdiction of the Federal courts, including the bankruptcy courts. However, pursuant to an understanding between the Committee on the Judiciary and the Committee on Public Works and Transportation, Mr. Mineta has offered an amendment to section 9 of H.R. 2121 clarifying that nothing in the proposed act shall be construed to limit or otherwise affect the jurisdiction of the Federal courts to make determinations in bankruptcy cases and proceedings.

Under current law, the Federal courts (and the bankruptcy courts) have broad jurisdiction to make determinations in cases filed under the Bankruptcy Code. See, for example, 28 U.S.C. 157 and 1334, and Bankruptcy Rule 9019. Moreover, with regard to undercharge claims file by bankrupt motor carriers, specific recognition has been given to the broad jurisdiction of the courts. *White v. U.S.,* 989 F.2d 643 (3d Cir.1993). Despite their broad jurisdictional authority, where time permits and pursuant to the doctrine of primary jurisdiction, the Federal courts may choose to defer to the expertise of the Interstate Commerce Commission (ICC) with respect to specific issues. See *Reiter v. Cooper,* 113 S.Ct. 12133 (1993). Once the ICC has considered the matter, the applicable Federal court may choose to incorporate some or all of the ICC's findings into the overall adjudication of the bankruptcy case.

The current procedure permits the Federal courts to assure the timely and fair administration and adjudication of bankruptcy cases. Pursuant to changed language of section 9 of the act from the language reported from the Public Works Committee, the Federal courts including the bankruptcy courts, will continue to have jurisdiction to make determinations in connection with motor carrier undercharge claims and related issues where the motor carrier has sought the protection of the Bankruptcy Code. As a result of this provision, in the event of a bankruptcy filing, reference in the act to resolution by, determinations by, and review and approval by the Commission shall be subject to the original jurisdiction of the Federal courts pursuant to 28 U.S.C. 157 and 1334.

139 Cong.Rec.H. 9603 (Nov. 15, 1993) (remarks of Rep. Brooks).

### *Appendix B*

Section 10701(f) of the NRA provides:

(f) PROCEDURES FOR RESOLVING CLAIMS INVOLVING UNFILED, NEGOTIATED TRANSPORTATION RATES.—

(1) **In general**—When a claim is made.... by a party representing [a motor carrier] regarding the collection of rates or charges for such transportation in addition to those originally billed and collected by the carrier or freight forwarder for such transportation, the person against whom the claim is made may elect to satisfy the claim under the provisions of paragraphs (2), (3), or (4) of this subsection, upon a showing that—

(A) *the carrier or freight forwarder is no longer transporting property or is transporting property for the purpose of avoiding the application of this subsection;* and....

(B) with respect to the claim—

(i) the person was offered a transportation rate by the carrier or freight forwarder other than that legally on file with the Commission for the transportation service;

(ii) the person tendered freight to the carrier or freight forwarder in reasonable reliance upon the offered transportation rate;

(iii) the carrier or freight forwarder did not properly or timely file with the Commission a tariff providing for such transportation rate or failed to enter into an agreement for contract carriage;

(iv) such transportation rate was billed and collected by the carrier or freight forwarder; and

(v) the carrier or freight forwarder demands additional payment of a higher rate filed in a tariff.

If there is a dispute as to the showing under subparagraph (A), such dispute shall be resolved by the court in which the claim is brought. If there is a dispute as to the showing under subparagraph (B), such dispute shall be resolved by the Commission. Pending the resolution of any such dispute, the person shall not have to pay any additional compensation to the carrier or freight forwarder. Satisfaction of the claim under paragraph (2), (3), or (4) of this subsection shall be binding on

the parties, and the parties shall not be subject to chapter 119 of this title.

**(2) Claims involving shipments weighing 10,000 pounds or less.**—A person from whom the additional legally applicable and effective tariff rate or charges are sought may elect to satisfy the claim if the shipments each weighed 10,000 pounds or less, by payment of 20 percent of the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid. In the event that a dispute arises as to the rate that was legally applicable to the shipment, such dispute shall be resolved by the Commission.

**(3) Claims involving shipments weighing more than 10,000 pounds.**—A person from whom the additional legally applicable and effective tariff rate or charges are sought may elect to satisfy the claim if the shipments each weighed more than 10,000 pounds, by payment of 15 percent of the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid. In the event that a dispute arises as to the rate that was legally applicable to the shipment, such dispute shall be resolved by the Commission.

**(4) Claims involving public warehousemen.**—Notwithstanding paragraphs (2) and (3), a person from whom the additional legally applicable and effective tariff rate or charges are sought may elect to satisfy the claim by payment of 5 percent of the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid if such person is a public warehouseman. In the event that a dispute arises as to the rate that was legally applicable to the shipment, such dispute shall be resolved by the Commission.

**(5) Effects of election.**—When a person from whom additional legally applicable freight rates or charges are sought does not elect to use the provisions of paragraph (2), (3), or (4), the person may pursue all rights and remedies existing under this title.

**(6) Stay of additional compensation.**—When a person proceeds under this section to challenge the reasonableness of the legally applicable freight rate or charges being claimed by a carrier or freight forwarder described in paragraph (1) in addition to those already billed and collected, the person shall not have to pay any additional compensation to the carrier or freight forwarder until the Commission has made a determination as to the reasonableness of the challenged rate as applied to the freight of the person against whom the claim is made.

**(7) Limitation on statutory construction.**—*Except as authorized in paragraphs (2), (3), (4), and (9) of this subsection,* nothing in this subsection shall [relieve a motor carrier of his duty to file and charge his filed rates].

\*     \*     \*     \*     \*     \*

**(9) Claims involving small business concerns, charitable organizations, and recyclable materials.**—Notwithstanding paragraphs (2), (3), and (4), *a person from whom the additional legally applicable and effective tariff rate or charges are sought shall not be liable for the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid*—

(A) if such person qualifies as a small business concern under the Small Business Act (15 U.S.C. 631 et seq.).

(B) if such person is an organization which is described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code, or

(C) if the cargo involved in the claim is recyclable materials, as defined in section 10733.